# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Staff Sergeant WILBER J. MCINTOSH, JR.
### United States Air Force

## ACM 37977

## 17 January 2014

Sentence adjudged 15 April 2011 by GCM convened at Joint Base Andrews Naval Air Facility Washington, Maryland. Military Judge: Paula B. McCarron.

Approved Sentence: Dishonorable discharge, confinement for 25 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant: Major Zaven T. Saroyan (argued) and Major Daniel E. Schoeni.

Appellate Counsel for the United States: Captain Thomas J. Alford (argued); Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Lieutenant Colonel Martin J. Hindel; Major Brian C. Mason; and Gerald R. Bruce, Esquire.

Before

ORR, ROAN, and MARKSTEINER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

ORR, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of one specification of rape of a child who had attained the age of 12 years but had not attained the age of 16 years, on divers occasions; one specification of aggravated sexual abuse of a child on divers occasions; one specification of assault with the intent to commit rape; and one specification of communicating a

threat, in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934.[1] The adjudged and approved sentence consisted of a dishonorable discharge, confinement for 25 years, forfeiture of all pay and allowances, and reduction to E-1.

The appellant raises 19 issues for our consideration.[2] He asks this Court, *inter alia*, to determine: (1) Whether the military judge abused her discretion by allowing a social worker from Child Protective Services (CPS) to testify about the reason the appellant's wife lost custody of BH; (2) Whether the social worker's testimony violated the appellant's right to confrontation; (3) Whether Charge III and its specifications fail to state an offense because they fail to allege a terminal element; (4) Whether the evidence is legally sufficient to support the appellant's conviction of the specifications of Charge I and Specification 1 of Charge III; (5) Whether the military judge erred by failing to sua sponte dismiss members from the panel; (6) Whether the appellant received ineffective assistance of counsel (IAC); (7) Whether trial counsel's sentencing argument unduly inflamed the passions of the panel; and (8) Whether the cumulative errors in this case prevented the appellant from receiving a fair trial. We granted the appellant's request for oral argument on whether the military judge abused her discretion by allowing the CPS social worker's testimony and IAC issues. Additionally, we carefully reviewed each assignment of error raised and address, in detail, the most significant ones below.

We find that Specifications 1 and 2 of Charge III fail to state an offense because they do not allege a terminal element. As a result, the finding of guilt as to Charge III and its Specifications is set aside and dismissed. The remaining findings are correct in law and fact.

*Background*

The appellant married CD in 2000. At the time, CD had a 3-year-old daughter, BH, from a prior relationship. The appellant and CD subsequently had three boys together. During the time frame encompassing the events in this case, the family lived in Montgomery, Alabama; Lorton, Virginia (VA); and Alexandria, VA. BH testified she used to call the appellant "daddy" and had a "really good relationship" with him, but in the summer of 2006, when she was about eight years old, he began to sexually abuse her. BH described the abuse as him touching her privates and butt and "he would have sex with [her]." BH testified this happened more than once when they lived in Alabama, and continued while they lived in Virginia. BH says she did not tell anyone what the

---

[1] The appellant was acquitted of two specifications of sodomy, in violation of Article 125, UCMJ, 10 U.S.C. § 925.
[2] Thirteen issues are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and assert: a Mil. R. Evid. 615 violation; two claims of ineffective assistance of counsel; failure to state an offense; inflammatory argument by trial counsel; structural, constitutional, and non-constitutional error; prosecutorial misconduct; failure to instruct on chain of custody; abuse of discretion by the military judge for permitting social worker testimony; abuse of discretion by the military judge for failure to grant a mistrial; cumulative error; legal insufficiency; and factual insufficiency.

appellant was doing because she "was so little that [she] didn't know what was going on" and the appellant told her he would kill her and her family if she ever told anyone.

A childhood friend of BH, VJ, testified that she once walked into BH's bedroom in Alabama and saw the appellant on top of BH, holding her hands down behind her head and "moving his pelvis . . . hard up and down." BH was kicking and crying, and she pleaded to her friend, "Help me [VJ], get him off." The appellant told VJ he would do the same thing to her if she tried to help, so VJ sat in a corner of the room and cried. BH asked VJ to never say anything about what she saw.

CD testified that in May 2007, after the family moved to Lorton, VA, she woke up one night and noticed the appellant was not in bed with her. Searching the house, she could not find the appellant but discovered the door to BH's bedroom was locked. She banged on the door and began cursing. When the appellant opened the door, CD saw him pulling up his underwear. BH was sitting up in bed with only her t-shirt on and her underwear under her armpit. The appellant began to apologize, saying he had a problem, but CD chased him out of the house with a baseball bat. CD took the boys and BH to her sister's house, and then went to the police department. In response to this incident, CD took the children and moved out of the Lorton residence, and eventually moved to Alexandria, VA.

Despite that, the appellant eventually moved back in with his family at the Alexandria residence around August 2008. In November 2009, CD's sister TD and her children were also living in the house. TD testified that one night she got up to go to the bathroom and saw the appellant standing next to BH's bed. The appellant had one hand down the crotch of his pants and was touching BH's chest with his other hand. After TD told her sister CD what she observed, CD kicked TD and her children out of the house. CD also moved her daughter BH downstairs to another room with a lock on the door.

BH testified the last sexual assault occurred on 5 April 2010. BH told the panel members that on that day she overslept and did not go to school. The appellant found BH using the computer in her mother's bedroom. BH attempted to leave, but he forcefully pushed her onto the bed. Once she was on her stomach, he removed her clothes and "put his private part into [her] butt." BH told a school guidance counselor what had happened, and a law enforcement investigation was initiated. As a result of the investigation, the Juvenile and Domestic Relations District Court in Alexandria, VA, removed BH from CD's custody on the basis that she failed to protect BH from the appellant's molestation.

*Child Protective Services (CPS) Witness Testimony*

The appellant argues the military judge abused her discretion when she permitted a CPS employee, GF, to testify over defense objection that CD lost custody of BH "[b]ecause [CD] failed to protect [BH]" from "allegations of sexual abuse." The

appellant also argues allowing this testimony was constitutional error because it invoked the judgment of a civil court in the appellant's court-martial, thereby confusing the civil and criminal burdens of proof. As a result, the court members were permitted to improperly use the civil court's conclusion as evidence of the appellant's guilt. Additionally, the appellant argues that this testimony violated his Sixth Amendment[3] right of confrontation because GF's testimony "incorporated" another witness's affidavit. While rejecting the appellant's confrontation argument, we find that the military judge's limiting instruction concerning GF's testimony was deficient. Nevertheless, we find the error, if any, harmless because it did not confuse the civil and criminal burdens of proof, nor have a substantial influence on the findings.

GF's testimony regarding the District Court's decision to remove BH from CD's custody was elicited at the conclusion of the Government's case-in-chief, after protracted argument by counsel over its admissibility under Mil. R. Evid. 403, divergent rulings by the military judge, and questions posed by three court members. A chronology of events from the trial is relevant to resolving this issue.

## I. The Subject of Child Custody

Civilian trial defense counsel (hereinafter "Civ. DC") first introduced the subject of BH's custody at the court-martial in voir dire. He initially proposed the idea that false accusations of sex abuse could be manufactured to effect custody battles and that CD had the potential to encourage her children to falsely accuse the appellant to prevent him from getting custody. The panel of members agreed that a parent could influence a child's testimony. Civ. DC continued to make custody an issue when he asked if any of the members had been involved in divorce proceedings that involved contested custody issues.

Although trial counsel did not refer to the subject of custody during her opening statement, Civ. DC referenced it during his opening statement when he told the members, "[CD's sister] actually has physical custody of [BH] right now because the State has apparently taken [BH] away from [CD]." Civ. DC then turned to the subject of an October 2006 separation agreement. This agreement, according to Civ. DC, provided for joint legal custody of the three boys, with primary physical custody belonging to CD but only until the oldest boy turned 12 years old in April 2013, at which point physical custody would go to the appellant. Civ. DC told the members:

> Now what goes along with the custody being transferred is a termination of child support. You're going to hear from a woman who basically says she was in and out of shelters. Also financial issues are a major scenario here. So you hear about well, when she loses custody she also loses child-support

[3] U.S. CONST. amend. VI.

and the three boys go to live with him . . . . [T]he May 2007 time frame is where [CD] supposedly gets up and she sees him in [BH's] room . . . . [The] [t]iming of this accusation . . . is very convenient and very interesting. It is within days of [CD] getting a copy of the final divorce decree . . . . A court order [that] says [the appellant] gets the kids in 2013[,] you lose your child-support. So it's hard to imagine that in today's environment that someone could be so twisted to use this type of an accusation to try to keep custody and money. But I believe that's exactly what the evidence is going to show you.

At one point during opening statement, Civ. DC argued CD's plan "backfired" on her, because she lost custody of her children, but the military judge sustained trial counsel's objection on the basis that the statement was argumentative. Nevertheless, Civ. DC rejoined: "The evidence will show that [CD] lost custody of the kids. That [the appellant's] family now has the kids, so call it what you want that's where things are at this particular point."

The Government's first witness was the victim, BH. Although trial counsel asked BH who she was currently living with, she was not questioned why she was not living with her mother. On cross-examination, however, Civ. DC asked BH:

Q. You live with [TD], right now is that right?

A. Yes.

Q. Do you know why you are living with [TD]?

A. Yes.

Q. Why is that?

A. Because I got removed from my house.

When the Government called CD, trial counsel asked her whether there was a time BH had to leave the home in Alexandria. CD testified that BH left in April of 2010 because CPS removed BH from her home. In response, Civ. DC asked CD whether she had custody of her four children. She acknowledged that she wanted to keep her children with her but the court granted custody of her boys to her parents in December 2010. She also testified that she had signed a settlement agreement in October 2006 and under the terms of the agreement she would receive $600 per month per child in child support, but she would lose physical custody of her boys to the appellant when the oldest turned 12 years old. On re-cross, Civ. DC asked, "[I]t's going to be a whole heck of a lot easier to

get your kids back if he's sitting in jail someplace, correct?" CD replied, "I don't know," and stated the appellant's mother was also trying to obtain custody of the boys.

## II. The Virginia Adjudicatory Order & Affidavit

Near the end of its case-in-chief, the Government offered a five-page Virginia Juvenile and Domestic Relations District Court Order (hereinafter "Order") which contained a finding that CD had failed to protect BH from molestation by the appellant. Civ. DC objected and argued the exhibit was irrelevant, contained hearsay and was "extraordinarily prejudicial under [Mil. R. Evid.] 403." In response, trial counsel argued the defense had opened the door by making "[CD's] loss of custody an issue," therefore "it's only fair that the members get to see the actual court order that says this is why [CD] no longer has custody of [BH]." The military judge sustained the defense objection because the different standard of proof would confuse the members and the Order also stated the ultimate conclusion.

The Government later reoffered the same exhibit with the ultimate conclusion language redacted. Trial counsel argued the document directly contradicted the defense theory that "this family is concocting this . . . to have [the appellant] out of the house," because CD "in fact got more of a benefit from having [the appellant] in the home and didn't protect her daughter like she should have." Trial counsel also suggested the exhibit "corroborate[d] [TD] on the cross-examination lobbied by the defense counsel." After an overnight recess, the military judge again sustained the defense's objection, noting, "[W]hile [the Order] is probative to rebut the defense's theory of the case . . . [its] probative value is outweighed by its prejudice."

## III. The Testimony of GF

At the end of their case-in-chief, the Government called GF, a social worker employed with CPS, to testify as to why BH was removed from the home. Trial counsel explained GF would testify that BH was taken out of her mother's home involuntarily because CD failed to protect her daughter from 2007 to 2010. Civ. DC objected, first labelling GF a hearsay witness and then arguing that her testimony was irrelevant and would necessarily imply a judicial finding by the State of Virginia that BH had been abused and neglected. The military judge ultimately allowed GF to testify, but limited her testimony as follows:

> [BH] was removed from the home, this wasn't a voluntary decision, and that she was removed from the home because [CD] failed to protect her. That's it. That's all I'm going to allow [GF] to do.

The military judged then expounded on her reasoning.

I find the probative value is outweighed, substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. So I have done the balancing test under [Mil. R. Evid.] 403 and come down on the fact that the probative value is substantially outweighed by the danger of unfair prejudice. To the extent there is any unfair prejudice, I will give a limiting instruction. And, trial counsel, I'm going to ask you to draft one that the members aren't to speculate about the reasons for [BH] being removed from the home . . . [or what] [CD] did or didn't do that failed to protect [BH].[4]

Trial counsel then called GF. During direct examination, Civ. DC objected, arguing the questions and answers went beyond what the military judge authorized. As a result, the military judge held an Article 39(a) UCMJ, 10 U.S.C. § 839(a), session to question GF herself. Civ. DC continued to object, arguing that "basically, we have a state agency who is sanctioning that this child has been removed [because she was abused by the appellant]." The military judge noted the objection, conducted an additional balancing test under Mil. R. Evid. 403, and decided to allow GF's testimony with a limiting instruction that the members were not to speculate.

After the members were called back in, GF testified that CD lost custody of her daughter, BH was taken out of CD's home, and the reason was "[CD] failed to protect [BH] between 2007 and 2010." Civ. DC elected not to ask GF any questions, but three members had questions for GF. All three questions asked GF to further explain and clarify what CD failed to protect BH from.

In the ensuing Article 39(a), UCMJ, session, Civ. DC moved for a mistrial. The military judge denied the motion for a mistrial and ruled, over defense objection, that she would permit the witness to answer the members' questions. The military judge stated:

The reason that we are all here today is because of the allegations – underlined, highlighted – and I stress that word, of the accused's misconduct. The resolution of these allegations rests firmly with the members. [BH] was removed from her mother's custody because she allegedly failed to protect BH against the allegations that have been made by [BH] against the accused. The fact that [BH] was removed from the

---

[4] On multiple occasions, the military judge recited the Mil. R. Evid. 403 balancing test and concluded the probative value was substantially outweighed by the danger of unfair prejudice. However, each time the military judge allowed the evidence to be admitted and even developed a limiting instruction for the members. Thus, we conclude the military judge made the appropriate balancing test and intended that the testimony be admitted, but misspoke when she put her ruling on the record. The record of trial supports this finding and indicates all parties to the court, to include counsel, understood this to be the military judge's finding.

home doesn't invade the province of these members to make a determination as to the accused's guilt or innocence.

Civ. DC continued to object arguing the military judge's ruling was contradictory to her previously ruling with regard to the Order. The military judge said she had reconsidered her earlier ruling and she believed the members, based upon their age and experience and her instructions, would not conclude the accused is guilty of the offenses because BH was removed from the home. When the members returned, GF was asked what CD "allegedly failed to protect [BH] from." GF testified it was from "allegations of sexual abuse."

After cross-examination, the military judge instructed the members: "Members, you are not to conclude from [GF]'s testimony that the accused is a bad person, or has criminal tendencies and that he, therefore, committed any offenses charged."

In her final instructions to the court members, prior to deliberations on findings, the military judge repeated this instruction, without objection or a request for additional instruction by Civ. DC: "As I advised you earlier, the testimony of [GF] was offered for a limited purpose. It may not be used by you to conclude that the accused is a bad person or has criminal tendencies and that he, therefore, committed any offense charged."

## IV. Admission of GF's testimony under Mil. R. Evid. 403

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citing *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). If we find error, we review de novo the question of whether an error was harmless. *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002). We test constitutional error by determining whether the error was harmless beyond a reasonable doubt, while looking to see if a nonconstitutional error has a substantial impact on the findings. *Id*. If the test is met, or if an onlooker is left in grave doubt, we cannot uphold the conviction. *See Kotteakos v. United States*, 328 U.S. 750 (1967).

We begin our review by examining whether GF's testimony was relevant. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. Generally, under Mil. R. Evid. 402, relevant evidence is admissible. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members." Mil. R. Evid. 403. "The

overriding concern of [Mil. R. Evid.] 403 'is that evidence will be used in a way that distorts rather than aids accurate fact finding.'" *United States v. Stephens*, 67 M.J. 233, 236 (C.A.A.F. 2009) (quoting Stephen A. Saltzburg, et al., *Military Rules of Evidence Manual* § 403.02[4], at 4-27 (6th ed. 2006)).

Ordinarily, evidence concerning child custody rulings by a civilian court would not be relevant in a sexual abuse case. However, the Government in this case offered the challenged evidence as rebuttal evidence. "It is well settled that the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party." *United States v. Hallum*, 31 M.J. 254, 255 (C.M.A. 1990); *See also United States v. Banks*, 36 M.J. 150 (C.M.A. 1992), *United States v. Cleveland*, 29 M.J. 361, 363 (C.M.A. 1990); *United States v. Wirth*, 18 M.J. 214, 218 (C.M.A. 1984). The scope of rebuttal is defined by evidence introduced by the defense. *Banks*, 36 M.J. at 166; *Hallum*, 31 M.J. at 254. Although a "single passing comment" by trial defense counsel in opening statement may not be sufficient to open the door to otherwise irrelevant evidence, a different conclusion may be reached when a defense theory is not only introduced in opening statement, but acquires support through cross-examination of Government witnesses. *See United States v. Turner*, 39 M.J. 259, 262 (C.M.A. 1994). *Compare United States v. McGuire*, 808 F.2d 694, 696 (8th Cir. 1987) (holding it was error for the Government to introduce rebuttal evidence in its case-in-chief based on a statements made during defense's opening, but not pursued by defense), *with United States v. Goodapple*, 958 F.2d 1402, 1407 (7th Cir. 1992) (holding it was proper for the Government to introduce rebuttal evidence in its case-in-chief when defense clearly raised a defense in its opening statement and pursued the defense in cross-examination and with its own witnesses).

Evidence which is generally inadmissible may be admissible in narrow and limited circumstances such as rebuttal when a party opens the door by presenting potentially misleading testimony. *See generally United States v. Robinson*, 485 U.S. 25, 33 (1988); *United States v. Bresnahan*, 62 M.J. 137, 146 (C.A.A.F. 2005); *United States v. Banks*, 36 M.J. 150, 162 (C.M.A. 1992). Nevertheless, the military judge cannot admit evidence with "reduced, if nonexistent probative value" that has a "high potential for prejudice and confusion of issues." *United States v. Baumann*, 54 M.J. 100, 105 (C.A.A.F. 2000).

In the present case, GF's testimony was relevant to the extent it rebutted the defense's theory of the case, introduced in voir dire, advanced in the opening statement, and explored during cross-examination of Government witnesses, that CD had manufactured the allegations against the appellant to obtain custody of her children and child support/money. Civ. DC elicited, on cross-examination, that CD did not have physical custody of any of her children; that her three boys were living with the appellant's parents because of a court order; that BH was living with TD because she had been "removed" from the home; and that CD wanted to raise all of her children. Civ. DC also asked BH why she was removed from her home. Left unexplained, this evidence

lent credence to the defense theory that CD wished to damage the appellant's parental rights in order to re-acquire custody of her children. The admission of the reason for BH's removal from CD's custody not only explained evidence elicited by the defense, but also countered the defense's theory by showing that CD did not advance her financial and custody interests by testifying against the appellant.

Nevertheless, GF's testimony carried the risk of unfair prejudice to the appellant, a concern the military judge initially noted when conducting her Mil. R. Evid. 403 balancing test. When a military judge conducts a proper balancing test, the military judge enjoys a "wide discretion" and the ruling will not be overturned unless there is a clear abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation and internal quotation marks omitted). However, we give military judges less deference if the balancing test is not on the record, and no deference if a Mil. R. Evid. 403 balancing test is not conducted on the record. *Id. See also United States v. Pope*, 69 M.J. 328, 333 (C.A.A.F. 2011).

When conducting the Mil. R. Evid. 403 balancing test in this case, the military judge conditioned her ruling on a subsequent limiting instruction. After GF's testimony was expanded as a result of the court members' questions and Civ. DC's objection, the military judge referenced her previous balancing test and stated, "I saw and continue to see no reason why a curative or limiting instruction does not resolve the concerns." The instruction she ultimately provided court members, however, did not specifically address Civ. DC's concerns raised by GF's testimony, which was the inference of guilt arising from a civil or administrative custody decision having been made as a result of "allegations of sexual abuse." Even though GF's testimony did not reference a civil court finding or conclusion, it necessarily implied that *someone* with authority to remove a child from a parent's custody believed the allegations. Rather than specifically address the danger of unfair prejudice arising from this inference, the military judge's instruction only informed the court members that the evidence could not be used "to conclude that the accused is a bad person or has criminal tendencies and that he, therefore, committed any offense charged."

Because the military judge's limiting instruction was not incorrect, we find no abuse of discretion. Nevertheless, we assess for prejudice because the military judge's limiting instruction implied but did not expressly inform the panel members that they alone had the duty to decide whether the appellant was guilty or not guilty based on the evidence they heard and the findings of the civilian court should have no bearing in their decision. After doing so, we disagree with the appellant's contention that GF's testimony confused the civil and criminal burdens of proofs for the members and thereby amounted to constitutional error. GF's testimony primarily focused on whether CD initiated the state court action to remove BH from her custody. GF's testimony only referenced "allegations of sexual abuse," she did not explain that the determination was made at a civilian court, she did not reference any standard of proof for the civilian court, and the

military judge properly instructed the members on the Government's burden of proof beyond a reasonable doubt. We find the military judge's decision to admit GF's testimony was not error, but even if it was error, it would have been nonconstitutional error and in light of the other evidence of the appellant's guilt, it had no substantial impact on the findings.

*Confrontation Clause*

The appellant contends the military judge's admission of GF's testimony also violated his right to confront TT who authored an affidavit attached to the the Order. Although neither the Order nor the affidavit was admitted into evidence, the appellant claims "[GF]'s testimony was "based on a review of the ruling which expressly incorporated and included [TT's] affidavit."

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This protection "bars the admission of testimonial statements of a witness who did not appear at trial unless the witness was unavailable to testify and the [accused] had a prior opportunity for cross-examination." *United States v. Harcrow*, 66 M.J. 154, 158 (C.A.A.F. 2008) (citing *United States v. Crawford*, 541 U.S. 36, 53-54 (2004)). While a military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion, "the antecedent question [of] whether evidence constitutes . . . testimonial hearsay [] is a question of law reviewed de novo." *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010). A statement is testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 442. Testimonial statements include "prior testimony that the defendant was unable to cross-examine" and out of court statements made in testimonial materials such as an affidavit. *Crawford*, 541 U.S. at 51-52. "[T]he right of confrontation is not satisfied by confrontation of a surrogate for the declarant." *United States v. Blazier*, 69 M.J. 218, 223 (C.A.A.F. 2010).

We need not determine whether TT's affidavit is testimonial as neither her affidavit nor her out-of-court statements were admitted into evidence. GF testified based on her knowledge—not TT's out of court statements—of the decision to remove BH from CD's custody and the rationale for the decision. As a social worker employed by the Alexandria Department of Community and Human Services, GF described BH as a child "on [her] caseload." There was no indication that GF lacked personal knowledge of the removal decision and was merely acting as a surrogate for another witness. *See* Mil. R. Evid. 602. The appellant was free to cross-examine GF and did in fact cross-examine her by eliciting that the removal decision was a result of allegations against the appellant.

In his second assignment of error, the appellant argues that the specifications of Charge III fail to state an offense because they lack the terminal element under Article 134, UCMJ, and must therefore be set aside and dismissed.

Whether a charge and specification state an offense and the remedy for their failure to do so is a question of law that we review de novo. *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006) (citations omitted). "A specification states an offense if it alleges, either expressly or by [necessary] implication, every element of the offense, so as to give the accused notice and protection against double jeopardy." *Id.* at 211 (citing *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994)). The terminal element of Article 134, UCMJ, is a distinct element that must be separately charged and proven, so it is error to fail to allege the terminal element expressly or by necessary implication. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012).

"[W]here defects in a specification are raised for the first time on appeal, dismissal of the affected charges or specifications will depend on whether there is plain error." *United States v. Humphries*, 71 M.J. 209, 213 (C.A.A.F. 2012). In analyzing defective indictments for plain error, "the appellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the [appellant]." *Humphries*, 71 M.J. at 214 (citations and alterations ommited). In determining plain error, a "defective specification alone is insufficient to constitute substantial prejudice to a material right." *Id.* at 215. Rather, the question is "whether the defective specification resulted in material prejudice to [the appellant's] substantial right to notice." *Id.* Mindful of this, we examine the trial record "to determine whether notice of the missing element is somewhere extant in the trial record, or . . . is essentially uncontroverted." *Id.* at 215-16 (citations and quotation marks omitted). In making this inquiry, we are limited to considering evidence contained in the record of trial. *See United States v. Tunstall*, 72 M.J. 191, 197 (C.A.A.F. 2013).

The failure to allege the terminal element in this case, though not raised at trial, was "plain and obvious error that was forfeited rather than waived." *Humphries*, 71 M.J. at 215; *see also United States v. Gaskins*, 72 M.J. 225, 232 (C.A.A.F. 2013). Moreover, we find that notice of the missing element was not "extant in the trial record," nor is there any indication the evidence of the terminal elements was "uncontroverted." Although the military judge's panel instructions correctly delineated the terminal elements of Article 134, UCMJ, this occurred "after the close of evidence and, [] did not alert [the appellant] to the Government's theory of guilt." *Humphries*, 71 M.J. at 216.

The Government acknowledges the terminal elements of the specifications of Charge III were not alleged and were not referenced in opening statements, during the merits case, or in closing arguments. Nevertheless, the Government argues the appellant

had fair notice of the Government's theory of proof because the terminal elements were discussed in the Article 32, UCMJ, 10 U.S.C. § 832, Investigating Officer's report. That discussion, however, occurred prior to referral, was outside of the trial record, and did not dictate which terminal elements or theories of proof the Government could pursue at trial.

Because we can find nothing in the trial record that reasonably placed the appellant on notice of the Government's theory as to which clause of the terminal element of Article 134, UCMJ, he violated, we are compelled to set aside and dismiss Charge III and its Specifications. Having dismissed Charge III and its Specifications we reassess the sentence below.

*Legal and Factual Sufficiency*

In his third assignment of error, the appellant argues the evidence is legally and factually insufficient to support his conviction of Specifications 1 (rape of a child) and 2 (aggravated sexual abuse of a child) of Charge I.[5] Specifically, the appellant argues the Government failed to produce evidence that Specifications 1 and 2 of Charge I were committed on divers occasions during the time frames charged by the Government.

We may affirm only those findings of guilt that we determine are correct in law and fact and, on the basis of the entire record, should be approved. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The test for legal sufficiency is whether, when the evidence is viewed in the light most favorable to the Government, a rational factfinder could have found the appellant guilty of all the elements of the offense beyond a reasonable doubt. *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having personally observed the witnesses, this Court is convinced of the appellant's guilt beyond a reasonable doubt. *Reed*, 54 M.J. at 41 (citing *Turner*, 25 M.J. at 325).

The elements of rape of a child who has attained the age of 12 years but has not attained the age of 16 years by using force, under Article 120, UCMJ, are: "(1) That the accused engaged in a sexual act with a child; (2) That at the time of the sexual act the child had attained the age of 12 years but had not attained the age of 16 years; and (3) That the accused did so by using force against that child." *Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45.b.(2)(b) (2008 ed.). The elements of aggravated sexual abuse of a child, under Article 120, UCMJ, are: "(1) That the accused engaged in a lewd act; and (2) That the act was committed with a child who has not attained the age of 16 years." *MCM*, Part IV, ¶ 45.b.(6). The definition of a "lewd act" includes "the intentional touching, not through the clothing, of the genitalia of another person, with an

---

[5] The appellant also argues the evidence is legally and factually insufficient to support his convictions under Charge III, but we need not address this in light of our decision setting aside and dismissing those Specifications because they fail to state an offense.

intent to abuse, humiliate, or degrade any person, or to arouse or gratify the sexual desire of any person." *MCM*, Part IV, ¶ 45.a.(t)(10)(A).

The charging window for the rape specification was between on or about 1 January 2009 and on or about 20 April 2010, which encompassed the period of time when CD and her children lived in Alexandria, Virginia.[6] During her testimony, BH described how the appellant's sexual abuse began in Alabama, in 2006, and generally described the abuse as touching her in her private area and butt and then having sex with her. When questioned by trial counsel, she elaborated on the abuse as follows:

Q. . . . What private part did he use to touch you?

A. His front.

. . . .

Q. Okay. Now you're 14 years old, do you know the terms penis and vagina?

A. Yes.

Q. When you say front are you referring to his penis?

A. Yes.

Q. Okay. When he would take his penis and he would touch you in your private parts where exactly on your body would that be?

A. My vagina and my butt.

Q. Okay, when he touched you did his penis actually go into your vagina and your butt?

A. Yes.

Q. Okay. And when he touched you with his hands did his hands ever go inside of your vagina and your butt?

A. No.

Q. Okay, what did he do with his hands?

_____

[6] CD testified that she and her children moved to Alexandria, Virginia, in November 2008.

A.  Just touched my vagina and my butt.

Q.  Okay, so underneath the panties but didn't really penetrate you?

A.  Yes.

BH further testified that she never told anyone about the abuse because the appellant threatened to kill her and her family if she did.  After eliciting that the abuse occurred in Alabama "more than one time," trial counsel later asked BH about events outside of Alabama and, if the appellant did anything to her, where that was.  BH replied, "Um, in Lorton and Alexandria."  When specifically asked what she experienced in Alexandria with respect to the appellant, BH replied:  "I experienced the touching and . . . him putting his penis into my private part."  BH also testified that she remembered, in Alexandria, VA, being on her stomach and calling for help and the appellant's "private part . . . in [her] butt."  She later described in greater detail how, on 5 April 2010, the appellant pushed her into a room and onto a bed, where he then "put his private part into [her] butt."  When trial counsel asked BH what she was doing when this was happening, BH replied, "I was screaming."  BH testified that the appellant bought her a cell phone after this assault, and that he had previously bought her gifts after a different assault.  When asked what he bought her, BH described a PlayStation Portable, which she owned while living in Alexandria.[7]

The charging window for the aggravated sexual abuse specification was between on or about 2 October 2007 and on or about 20 April 2010.  In addition to BH's testimony that she experienced "the touching" by the appellant in Alexandria, VA, BH also testified about a time she woke up in Lorton to her mother screaming at the appellant in her bedroom.  This event occurred in May 2007, prior to the charged time frame.  When trial counsel asked BH how she knew the appellant had put "his privates in [her] vagina and [her] butt," if she was asleep, BH stated, "[E]ven though I wasn't awake for it some times when I would wake up to go to the bathroom it would hurt in certain places."

Viewing the evidence in the light most favorable to the Government, we conclude a rational factfinder could have found the appellant guilty of Specifications 1 and 2 of Charge I on divers occasions as charged.  Viewed as a whole, BH's testimony describing the appellant's actions did not refer to single instances of rape and assault within the charging windows.  Moreover, the appellant's intent in touching BH's genitalia was clear from the testimony of CD and her sister, TD, and the evidence of his abuse of BH prior to charged offenses.  After weighing the evidence and making allowances for not having

---

[7] BH testified on cross-examination that she owned the PlayStation Portable when she was "upstairs."  When asked when that was, BH stated she did not know the exact time, but that she "moved downstairs" possibly in 2009.  She testified it was not in 2008, because she did not live "there" in 2008.

personally observed the witnesses, we are also convinced of the appellant's guilt beyond a reasonable doubt.

*Court Members*

The appellant also asserts that the military judge should have sua sponte excused Senior Master Sergeant (SMSgt) TD and Technical Sergeant (TSgt) TS from the panel because they were Security Forces members, and SMSgt KM because he knew of a friend who was a victim of physical abuse and had a close relative who was recently shot by her husband.

The appellant was tried by a panel of officer and enlisted members. During the preliminary group voir dire of the ten members, SMSgt KM and TSgt TS indicated that they knew or worked with a victim of sexual assault, physical abuse, or violence. During the individual voir dire, both of them were asked specifically about the extent of his knowledge or involvement with the victim of the abuse or assault. Trial defense counsel questioned the members on the impact of this knowledge or involvement and how it might affect their duties as court members. After completion of the voir dire, neither trial nor defense counsel made any challenges for cause. Both trial and defense counsel exercised their peremptory challenges.

The appellant does not dispute that because he did not challenge any of the three panel members for cause, he has waived his right to object on appeal unless we determine the military judge abused her discretion in not removing the members. *See United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004); *United States v. Velez*, 48 M.J. 220, 222 (C.A.A.F. 1998). In considering this question, we ask whether the military judge abused her discretion in concluding that the member's service on the court did not "raise a significant question of legality, fairness, impartiality, to the public observer pursuant to the doctrine of implied bias." *Strand*, 59 M.J. at 460. We find that she did not.

Our superior court has been clear that the fact that a member or someone close to him or her had been a victim of a similar crime is not an automatic disqualification. *See United States v. Terry*, 64 M.J. 295, 297 (C.A.A.F. 2007) (member was not *per se* disqualified in rape case when member's wife had been the victim of sexual assault); *United States v. Smart*, 21 M.J. 15, 19 (C.M.A. 1985) (member was not *per se* disqualified from sitting on a robbery case when he had been the victim of a similar crime). In addition, our superior court has said, "regardless of a member's prior exposure to a crime, it is often possible for a member to rehabilitate himself before the military judge by honestly claiming that he would not be biased." *Terry*, 64 M.J. at 303. Furthermore, our superior court has ruled that service as a security forces member is not grounds for *per se* disqualification. *See United States v Townsend*, 65 M.J. 460, 464. (C.A.A.F. 2008).

Having established that being the victim of a crime or service in law enforcement are not *per se* disqualifying, but a factor to consider in addressing the ultimate question, we next consider the impact of the voir dire as to whether the military judge should have removed any of the three panel members *sua sponte*. After reviewing each of the specific colloquies between the three panel members, civilian defense counsel, the military judge, and trial counsel, we find no abuse of discretion.

*Ineffective Assistance of Counsel*

The appellant claims his trial defense counsel were ineffective before, during, and after his trial because they failed to: (1) Advise him to wear the proper uniform for the Article 32, UCMJ, hearing; (2) Present exculpatory evidence at the Article 32, UCMJ, hearing; (3) Request a bill of particulars; (4) Dispute the charges at the Article 32, UCMJ, hearing; (5) submit defense objections to the Article 32, UCMJ, Investigation Officer (IO) in writing; (6) Contest the IO's decision that BH was not reasonably available; (7) Cross-examine Detective RP regarding her knowledge of the appellant's whereabouts or her interview with BH; and (8) Introduce evidence from the 2007 and 2010 sexual assault examination reports. He also contends his counsel left two Air Force Office of Special Investigations reports of investigations out of the record of trial prior to authentication, and improperly included a note from the appellant in the defense clemency submissions. He asks this Court to set aside the findings and the sentence because his counsel did not provide him with effective assistance.

We review de novo claims of ineffective assistance of counsel. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001).

Service members have a fundamental right to the effective assistance of counsel at trial by courts-martial. *United States v. Rose*, 71 M.J. 138, 143 (C.A.A.F. 2012) (citing *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012); *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *Padilla v. Kentucky*, 130 S. Ct. 1473, 1480-81 (2010)). To establish ineffective assistance of counsel, the appellant "must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). The appellant must establish that the "representation amounted to incompetence under 'prevailing professional norms.'" *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 690). In evaluating counsel's performance under the first *Strickland* prong, appellate courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688-89.

We apply a three-part test to determine whether an appellant has overcome the presumption of competence:

1. Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions . . . ?

2. If they are true, did the level of advocacy fall[] measurably below the performance . . . [ordinarily expected] of fallible lawyers?

3. If ineffective assistance of counsel is found to exist, is . . . there . . . a reasonable probability that, absent the errors, [there would have been a different result]?

*United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (internal quotation marks and citations omitted).

We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. In making that determination, we consider the totality of the circumstances, bear in mind "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work . . . [and] recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

In a declaration submitted pursuant to an Order from this Court, trial defense counsel describe multiple conversations with the appellant concerning the different tactical and strategic decisions made during the course of their representation. In most instances, trial defense counsel confirm the underlying facts the appellant raises to support his claim of ineffective assistance. Therefore, we find the appellant's allegations about his trial defense counsel's advice are accurate. The factual disputes if any center around whether the appellant agreed with the ultimate course of action taken by his counsel. When there are opposing affidavits raising a factual dispute that is "material" to the resolution of the post-trial claim, we need only resort to a fact-finding hearing if the alleged errors would not warrant relief even if the factual dispute was resolved in the appellant's favor. *United States v. Ginn*, 47 M.J. 236, 239, 248 (C.A.A.F. 1997). Such is the case at hand. After reviewing the Government's evidence presented during the Article 32, UCMJ, hearing, we believe these charges would have been referred to a court-martial even if his counsel had proceeded with the courses of action consistent with the appellant's declaration.

Moreover, there are reasonable explanations for the counsel's advice and their level of advocacy on the appellant's behalf was commiserate with that expected of defense counsel. *See Polk*, 32 M.J. at 153. The fact that their overall plan was not ultimately successful does not invalidate the defense strategy. Appellate courts give great deference to trial defense counsel's judgments, and "presume[] counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Morgan*, 37 M.J. 407, 409 (C.M.A. 1993); *Mazza*, 67 M.J. at 475.

Because the threshold for finding prejudice stemming from ineffective assistance of counsel for post-trial proceedings is lower, we separately examine trial defense counsel's (Captain BC) decision to submit the appellant's handwritten clemency letter. Given the options of submitting a timely handwritten submission, requesting another extension to submit clemency matters or not including *any* submission from the appellant, Captain BC chose to submit a timely handwritten submission. The appellant asserts that the convening authority did not seriously consider his clemency request because it was handwritten. We disagree.

We recognize that the convening authority is the appellant's best hope for clemency relief. *See United States v. Bono*, 26 M.J. 240, 243 n.3 (C.M.A. 1988) (citing *United States v. Wilson*, 26 C.M.R. 3, 6 (C.M.A. 1958)). As a result, our superior court imposed a lower threshold for claims of post-trial ineffective assistance of counsel. "[B]ecause of the highly discretionary nature of the convening authority's clemency power, the threshold for showing [post-trial] prejudice is low." *United States v. Lee*, 52 M.J. 51, 53 (C.A.A.F. 1999). Therefore, the appellant gets the benefit of the doubt and needs to make only a "'colorable showing of possible prejudice.'" *Id.* (citing *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998)).

The staff judge advocate's recommendation included a typed summary of the issues raised in the appellant's handwritten clemency submission. Also included in the record of trial is a signed endorsement from the convening authority confirming that he considered all the matters submitted by the appellant and his counsel prior to taking action on this case. Based on the facts before us, we do not find prejudice, but instead find that trial defense counsel acted within the expected norms of competent counsel. Although his decision to submit the handwritten note did not result in a grant of clemency, it was reasonable at the time and under the circumstances. Therefore, we will not second guess his strategic decision. *See Morgan*, 37 M.J. at 410. In sum, the appellant's trial defense counsel were not ineffective before, during, or after the appellant's trial.

*Findings Argument*

The appellant asserts trial counsel unduly inflamed the passions of the panel members by improperly misstating facts or evidence, which required his counsel to object

six times. We test "whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). Counsel should limit their arguments to "the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Id.* (citation omitted). *See also United States v. Paxton*, 64 M.J. 484, 487 (C.A.A.F. 2007). Whether or not the comments are fair must be resolved when viewed within the context of the entire court-martial. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001).

The appellant contends error occurred because trial counsel improperly argued the appellant threatened the lives of his three sons, that VJ (BH's childhood friend) was a disinterested party, and understated the number of rooms in the appellant's Alexandria house. He also contends it was error for the military judge not to sustain his counsel's objection to trial counsel's argument five out of the six times because there were no facts in evidence that would support her argument. Further, he believes the military judge's "curative instruction" telling the members that the arguments of counsel are not evidence was inadequate to cure the prejudice caused by trial counsel's improper argument. We disagree. Whether or not trial counsel's argument went beyond the evidence of record or any reasonable inference, we do not find that the appellant's rights were prejudiced by it.

*Cumulative Error*

Finally, the appellant argues he did not receive a fair trial. Specifically, he asserts that, even if none of his multiple assignments of error entitle him to relief, he is nevertheless entitled to relief under the cumulative error doctrine. *See United States v. Dollente*, 45 M.J. 234 (C.A.A.F. 1996); *United States v. Banks*, 36 M.J. 150 (C.M.A. 1992). As noted in *Dollente*:

> It is well-established that an appellate court can order a rehearing based on the accumulation of errors not reversible individually. [The cumulative-error doctrine] requires "consider[ing] each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy-or lack of efficacy—of any remedial efforts); and the strength of the government's case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial."

*Id.* at 242 (citing *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)).

Where we have granted relief after setting aside and dismissing Charge III and its Specifications and found all but one of remaining assignments of error to be without merit, we do not find the two errors warrant application of cumulative error doctrine.

We have considered the remaining assignments of error and find them to be without merit. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

*Sentence Reassessment*

Because we set aside the appellant's conviction for assault with the intent to commit rape and communicating a threat as alleged in Charge III and its Specifications, we must next determine whether reassessment of the sentence or a rehearing is required. Before reassessing a sentence, we must be confident "that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). This Court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, __ M.J. ___ No. 11-0280/AR, slip. op. at 3 (C.A.A.F. 18 December 2013). Our analysis must be based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelman*, slip op. at 13. A "dramatic change in the 'penalty landscape'" lessens our ability to reassess a sentence. *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003). Ultimately, a sentence can be reassessed only if we "confidently can discern the extent of the error's effect on the sentencing authority's decision." *United States v. Reed*, 33 M.J. 98, 99 (C.M.A. 1991). If we cannot determine the sentence would have been at least of a certain magnitude, we must order a rehearing.

The appellant received 25 years of confinement. Because the maximum punishment for rape includes confinement for life, setting aside Charge III and its Specifications does not change the maximum punishment the appellant faced. We believe the penalty landscape has changed somewhat – but not dramatically so – by the dismissal of Charge III and its Specifications. However, we believe the same evidence used to prove the assault with intent to commit rape and communicating a threat would have been admissible as aggravation, even if the Government elected not to prosecute the appellant for Charge III and its Specifications. In short, the remaining offenses capture the gravamen of the appellant's criminal conduct. Thus, we are confident that in the absence of the Specifications of Charge III, the panel members would have still imposed at least a dishonorable discharge, 25 years of confinement, total forfeiture of all pay and allowances, and reduction to E-1. We also find, after considering the appellant's character, the nature and seriousness of the offenses, and the entire record, that the reassessed sentence is appropriate. Article 66(c), UCMJ; *Sales*, 22 M.J. at 307-08.

*Conclusion*

The finding of guilty to Charge III and its Specifications are set aside and dismissed. The remaining findings are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred.[8] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). Accordingly, the remaining findings and the sentence, as reassessed, are

AFFIRMED.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[8] Though not raised as an issue on appeal, we note that the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. When we assume error, but are able to directly conclude that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *See United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006). This approach is appropriate in the appellant's case. The post-trial record shows no evidence that the delay had any negative impact on the appellant. In fact, on 28 May 2013, the appellant expressly waived his right to a speedy post-trial appellate review in his request to submit additional assignments of error. Having considered the totality of the circumstances and the entire record, we find that the appellate delay in this case was harmless beyond a reasonable doubt. *Moreno*, 63 M.J. at 135-36; s*ee also United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).