Judge GIERKE
delivered the opinion of the Court.
A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of two specifications of committing indecent acts with a child, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 USC § 934. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for four years, and reduction to the lowest enlisted grade. The convening authority waived, for a period not to exceed six months, the automatic forfeitures resulting from the sentence under Article 58b, UCMJ, 10 USC § 858b. The Court of Criminal Ap *175 peals affirmed the findings and sentence. 54 MJ 568 (2000).
This Court granted review of the following issue:
WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT HELD THAT THE ADMISSION OF THE STATEMENT OF APPELLANT’S WIFE WAS HARMLESS ERROR.
For the reasons set out below, we reverse.

Background

The incident giving rise to the charges against appellant occurred in Illesheim, Germany, shortly before appellant’s reassignment to the United States. The 11-year-old alleged victim, TR, was a Mend of appellant’s stepdaughter, Tamara.
The statement at issue was made by appellant’s wife, Mrs. Theresa Walker, in response to questioning by Special Agent (SA) Reasoner, an investigator from the U.S. Army Criminal Investigation Command (CID). In the statement, Mrs. Walker told SA Reasoner that appellant told her what happened, but that she did not wish to disclose it.
Before trial, the Government indicated its intent to call Mrs. Walker as a prosecution witness. At an evidentiary hearing, the defense presented a stipulation of expected testimony, establishing that Mrs. Walker would invoke her spousal privilege and would refuse to testify against her husband. The Government argued that Mrs. Walker’s statement to SA Reasoner was an admission by appellant under Mil.R.Evid. 801(d)(2), Manual for Courts-Martial, United States (2000 ed.).[1] Alternatively, the Government argued that the statement was admissible as residual hearsay under Mil.R.Evid. 804(b)(5).[2] The defense argued that the statement was privileged under Mil.R.Evid. 504. Over defense objection, the military judge admitted the statement as an admission under Mil.R.Evid. 801(d)(2).

The Trial on the Merits

On August 15, 1997, TR was invited to spend the night at appellant’s quarters. TR testified that appellant extended the invitation. Appellant’s wife was away on a shopping trip in Poland.
The quarters were sparsely furnished because most of the family’s household goods had been packed for shipment to the United States. The only furniture was a bed, two mattresses on the floor, and a television set.
TR testified that, during the evening, appellant, Tamara, and TR sat on a mattress and watched videotapes of “scary” movies. Appellant’s two younger daughters were asleep on the other mattress in the same room. The only light in the room was from the television set. TR testified that appellant drank about two cans of beer while they watched the movies. As the evening progressed, Tamara fell asleep on the mattress. TR testified that appellant told Tamara to get in the bed. Tamara moved to the bed and again fell asleep.
TR testified that appellant asked her to massage his shoulders, and she complied. After she rubbed appellant’s shoulders for “5 minutes or less,” appellant told her that she “wasn’t doing it right,” and they switched roles. TR testified that appellant removed her shirt and bra, touched her breasts, kissed her on her stomach and face, removed her shorts and underwear, removed his shorts, began “touching” himself, and positioned himself between her legs. She told appellant to stop four or five times, but he did not respond until Tamara awakened and called out “Dad” in a soft, sleepy voice. Appellant then rolled over, put on his shorts, and went into the back room to talk to Tamara.
TR testified she put her clothes back on and went to sleep on one mattress and that appellant and Tamara spent the night on the bed. The next morning, TR, Tamara, appellant, and the two younger children went *176 swimming. TR went to her nearby home to get her swimsuit and money, and then she returned to appellant’s quarters. After they returned from swimming, TR went home.
TR testified that appellant twice told her not to tell anyone what happened, once that evening and again about a week later. TR did not report the incident until approximately two months later, when her mother asked her what happened during the sleepover. She explained that she did not report the incident because she was embarrassed, she “didn’t want them to be mad at [her],” and she “didn’t want them to think that it was [her] fault and stuff.” On cross-examination by defense counsel, TR admitted that she did not mention the massage to the social worker or CID because she thought they would think it was her fault if she mentioned it.
A clinical social worker testified as an expert witness for the prosecution, explaining that victims of child sexual abuse tend to be embarrassed and afraid of being blamed. As a result, they tend to delay reporting and to withhold details until they are comfortable giving more information. The social worker opined that TR’s “presentation is very consistent with child sexual abuse,” and that TR “is compliant and somewhat passive.”
SA Reasoner testified about the statement, at issue in this case. When he interviewed appellant’s wife, she told him that when she returned from her shopping trip on August 17, two days after the alleged incident, “she had been told of an incident that occurred.” In a sworn, written statement, she said that appellant “did tell [her] what happened,” but she did not “wish to disclose what he said.” SA Reasoner’s testimony and the written statement were admitted over defense objection.
The defense theory was that nothing indecent or sexual happened, but “an innocent act ... was blown out of proportion by some well meaning, well intentioned, but overzealous individuals and agencies.” The defense asserted TR had been influenced by her mother, social workers, and CID to embellish an innocent incident. During a lengthy cross-examination, defense counsel elicited testimony from TR that she underwent persistent questioning, was interviewed “for a real long time,” and was asked questions “over and over again.”
During the defense case-in-chief, appellant testified that he, Tamara, and TR were sitting on the same mattress, and that he fell asleep while watching a movie. He did not directly dispute the testimony that he told Tamara to get into the bed, stating only that he did not know how Tamara got from the mattress to the bed. He was awakened by Tamara calling out “Dad.” He testified that he was startled when he discovered that he was lying beside TR with his arm around her. He testified that both he and TR were fully clothed. He denied giving TR a massage or touching her sexually.
Tamara testified for the defense. Contrary to TR’s testimony, she testified that she, not appellant, invited TR to spend the night. She testified that when she fell asleep on the mattress, appellant told her to get in the bed. She complied and promptly fell asleep again. When she awakened and saw her stepfather’s arm around TR, she yelled, “Dad, get up,” and she asked, “What are you doing?” Appellant replied, “Nothing.” According to Tamara, appellant “wasn’t shocked, he was like sleepy.” He then rolled off the mattress and went back to sleep. This testimony contradicted TR, who indicated that appellant was wide awake, and who testified that Tamara said only, “Dad,” and spoke in a soft, sleepy voice.
Tamara also testified that when she awakened, appellant was wearing a red shirt and red shorts, and TR was wearing cutoff blue jeans and a white shirt. This testimony contradicted TR’s testimony that appellant removed her shirt and shorts and took off his own shorts.
Tamara testified that she was “sort of’ worried that “something bad had happened,” and that she was worried appellant had “touched her.” She testified that she told her mother what she saw, and her mother replied, “[T]hat’s what your dad had said.”
The defense also presented evidence of good military character. Colonel Tyrone Graham testified that appellant was an “out *177 standing soldier.” He ranked appellant among the top three noncommissioned officers with whom he had worked. He testified that he respected appellant’s integrity, explaining that appellant addressed “some very—very contentious issues in supply accountability” and handled them “in an honest and forthright manner.”
In a stipulation of expected testimony, Lieutenant Colonel (LTC) John Poison testified that appellant worked for him for four years, and that he would rate appellant “in the top 1% of supply sergeants.” In another stipulation of expected testimony, LTC Nathan Keith testified that appellant “is the best supply sergeant I have seen in the United States Army.”
During argument on findings, the defense argued that TR was embarrassed because appellant had his arm around her, but that the incident was “blown out of proportion” when TR’s parents, the Military Police, CID, and other investigators kept asking her what happened. The defense argued that as TR was repeatedly questioned, “[t]he story is getting bigger and bigger.” The defense portrayed TR as “a passive, eager to please, child,” who “has been pulled into the system and is giving the answers she knows that they want.”
Defense counsel then referred to Mrs. Walker’s statement to SA Reasoner, which was not mentioned by trial counsel in her argument. Defense counsel argued:
In this statement, Mrs. Walker had a conversation with her husband, but she did not divulge what was in that conversation. The statement is not a statement. The government admitted that statement to slander the Walker family. The government wants you to infer that there is a conspiracy contained in that statement. Give the statement what it is worth: zero.
During trial counsel’s rebuttal argument, the following exchange took place:
TC: Captain Swanson brought up the CID statement that—the statement that Theresa Walker made to the CID agent. She didn’t want to disclose what her husband had told her. Why not if it was so innocent? Cynthia’s friend—Cynthia being the victim’s mother—had a conversation with one of her—one of Cynthia’s friends, and— which led her to confront—
MJ: Captain Gillespie [defense counsel]—
DC: Is this going where I think it’s going?
MJ: I don’t know, is that an objection I hear?
DC: It is if it’s going where I think it’s going, Your Honor.
MJ: I—
TC: Well, I don’t know where Captain Swanson thinks it’s going, but—
MJ: Well—but—
TC: Well, I’ll move away, and in the event that she thinks—
MJ: Well, yeah.
(Emphasis added.)
After this exchange in the presence of the members, there was no further mention of Mrs. Walker’s statement, no ruling on the propriety of the trial counsel’s argument, and no instructions to the members about the inference, if any, that they were permitted to draw from Mrs. Walker’s refusal to divulge what appellant had told her.
The Court of Criminal Appeals held that the military judge abused her discretion by admitting SA Reasoner’s testimony regarding Mrs. Walker’s statements and by permitting the Government’s attempt to draw an adverse inference from Mrs. Walker’s invocation of her spousal privilege. However, the court below held that the error was harmless because it “had no substantial influence on the findings.” 54 MJ at 572.

Discussion

The Government has not challenged the lower court’s holding that the military judge abused her discretion, either by certification or in its brief and oral argument. See United States v. Grooters, 39 MJ 269 (CMA 1994). Thus, the only issue we will address is whether the error was harmless.[3]
*178 We review de novo the question whether an error was harmless. See United States v. Grijalva, 55 MJ 223, 228 (2001) (review of constitutional error); United States v. Pablo, 53 MJ 356, 359 (2000) (review of nonconstitutional error). The test for constitutional error is whether the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The test for nonconstitutional error is “whether the error itself had substantial influence” on the findings. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). “If so, or if one is left in grave doubt, the conviction cannot stand.” Id.
The parties have briefed and argued the issue as a non-constitutional evidentiary error. We need not decide whether the parties have correctly characterized the error as non-constitutional, because the Government has failed to carry its burden of showing harmlessness under either test.
This case pitted the credibility of appellant against TR. Although Tamara contradicted appellant’s version of the events in some respects and corroborated TR’s version in some respects, Tamara’s testimony also contradicted TR on several key points and provided significant support for several critical aspects of appellant’s testimony. Specifically, Tamara testified that she invited TR to spend the night, contradicting TR’s testimony that appellant invited her and undermining the Government’s implication that appellant had designs on TR. Tamara testified that when she awakened and saw appellant on the mattress with TR, he apparently was asleep, and both he and TR were fully clothed. This testimony directly contradicted TR’s testimony that both appellant and TR were awake and wholly or partially disrobed on the mattress when Tamara awakened, and it supported appellant’s testimony that he was asleep and that he was fully clothed. Tamara’s testimony that she shouted at appellant contradicted TR’s testimony that appellant stopped touching her when Tamara said “Dad” in a soft, sleepy voice.
The heart of the defense was to portray TR as a passive, compliant child, who had embellished an inadvertent, innocent act in response to the intense, repeated, and suggestive questioning of a host of well-meaning adults. The admission of the hearsay statement of Mrs. Walker seriously undermined that defense, because it was used by the Government to show that, two days after the incident, long before anyone began questioning TR and long before she was subjected to the influences of well-meaning adults, appellant made a damaging admission to his wife. Even after trial counsel urged the members to make this inference, the military judge did nothing to prevent it. Under these circumstances, we are “left in grave doubt” whether the inadmissible statement unduly weighted the scales of justice against appellant and substantially influenced the findings. Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239. The Government has not met its burden of persuading us otherwise. Accordingly, we must reverse.

Decision

The decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing is authorized.

. All Manual provisions cited are identical to the ones in effect at the time of appellant's court-martial unless otherwise indicated.

. The residual hearsay rules formerly in Mil. R.Evid. 803(24) and 804(b)(5) are now merged in Mil.R.Evid. 807 as a result of the passage of 18 months from the date the Federal Rules of Evidence were similarly amended. See Mil.R.Evid. 1102.

. In United States v. Williams, 41 MJ 134, 135 n. 2 (CMA 1994), citing Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), this Court recognized that the law-of-the-case doctrine does not preclude this Court from examining the legal *178 ruling of a subordinate court in a case where the Judge Advocate General has not certified the issue. However, we have made it clear that we are reluctant to exercise this power and, as a rule, reserve it for those cases where the lower court’s decision is "clearly erroneous and would work a manifest injustice” if the parties were bound by it. Christianson, supra. In this case, the Government has not asserted that the lower court’s ruling that error occurred was "clearly erroneous and would work a manifest injustice” if adopted for purposes of this case. Accordingly, we will apply the law-of-the-case doctrine.