# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39319**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Kamron R. RAMESHK**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 October 2018

————————————

*Military Judge:* James R. Dorman.

*Approved sentence:* Dishonorable discharge, confinement for 8 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 20 April 2017 by GCM convened at Whiteman Air Force Base, Missouri.

*For Appellant:* Major Meghan R. Glines-Barney, USAF; Robert A. Feldmeier, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Tyler B. Musselman, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, DENNIS, and LEWIS, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Judge DENNIS and Judge LEWIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of failure to obey a lawful

order, two specifications of rape, and one specification of wrongfully endeavoring to impede an investigation on divers occasions in violation of Articles 92, 120, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 934.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for eight years, total forfeiture of pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence.

Appellant raises six issues on appeal: (1) whether the military judge erroneously applied Military Rule of Evidence (Mil. R. Evid.) 412 to exclude constitutionally required evidence; (2) whether the military judge committed plain error by admitting certain expert testimony; (3) whether Appellant's rape convictions are factually sufficient; (4) whether Appellant's sentence is unreasonably severe; (5) whether the military judge abused his discretion by failing to suppress statements Appellant made to his supervisor; and (6) whether the Government violated its discovery obligations by failing to secure and disclose exculpatory text messages.[2] We find no error that materially prejudiced Appellant's substantial rights. Accordingly, we affirm the findings and sentence.

## I. BACKGROUND

In May 2016, Appellant was a Security Forces Airman stationed at Whiteman Air Force Base (AFB), Missouri. On the night of 7 May 2016, Appellant attended a party at the off-base residence of another member of his squadron, Airman First Class (A1C) NG. The party consisted of four male Airmen—Appellant, A1C NG, A1C AW, and Airman Basic (AB) Joshua Benfield—and one female civilian drinking alcohol and socializing around an outdoor fire. The female civilian, JK, had been invited to the party by AB Benfield, with whom she previously had an intimate relationship and still considered a friend.[3] JK had never before met Appellant or the other attendees. During the course of the party, other attendees witnessed JK sit on AB Benfield's lap with her shorts somewhat lowered and witnessed her perform oral sex on AB Benfield.

---

[1] The military judge found Appellant not guilty of one specification of failure to obey a lawful order in violation of Article 92, UCMJ, 10 U.S.C. § 892.

[2] Appellant personally raises the fifth and sixth issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] AB Benfield was an Airman First Class at the time of the party. AB Benfield subsequently pleaded guilty and was convicted of sexual assault against JK at a general court-martial. *See United States v. Benfield*, No. ACM 39267, 2018 CCA LEXIS 335, at *1 (A.F. Ct. Crim. App. 10 Jul. 2018) (unpub. op.). After his conviction, AB Benfield testified as a prosecution witness at Appellant's trial.

The party broke up in the early morning hours of 8 May 2016. JK rode with AB Benfield and Appellant in JK's car to AB Benfield's nearby house. JK believed they were going to "hang out." JK later testified that once they went inside, AB Benfield removed JK's clothing, placed her on a sofa, and initiated sexual intercourse without her consent. As AB Benfield sexually assaulted JK, Appellant approached JK, put his hands on her head, and inserted his penis into her mouth without her consent. In the course of the assault, AB Benfield repeatedly struck JK on the back of her legs. AB Benfield eventually withdrew and Appellant then inserted his penis in JK's vagina. JK later testified that in the course of the assault she told both AB Benfield and Appellant to stop and pushed against them with her legs. After AB Benfield laid down to sleep and JK had put her shorts and pullover back on, Appellant pulled JK by her arm to a back room in the house. Appellant pushed JK against a wall and told her he "wasn't done" with her. However, JK resisted Appellant's efforts to remove her shorts until Appellant became upset and told her to leave. JK departed, leaving her purse behind.

From her car, JK called her mother, who did not answer. JK then contacted a male friend, DR. "[S]obbing and crying profusely" according to DR, JK told DR she had been raped by two Airmen. JK drove to DR's location. After JK arrived, DR called civilian police. JK later underwent a sexual assault forensic examination. Subsequent testing of samples taken during the exam did not indicate the presence of Appellant's DNA.

After the incident, Appellant participated in several conversations with one or more of the other three Airmen present at the party during which they discussed what they should say and not say to investigators. In particular, A1C AW recalled that he saw Appellant the morning after the incident, and Appellant denied having sexual intercourse with JK. A1C AW testified at trial that during this conversation Appellant instructed him to "not talk about the night. If anybody asks, we were just over a[t] [A1C NG's] house, just hanging out, having a good time. That is all the information [Appellant] wanted [A1C AW] to give." However, later that day Appellant told A1C NG that he did have vaginal intercourse with JK. Yet when A1C AW confronted Appellant a few days later, after rumors of a sexual assault began to circulate in the squadron, Appellant again denied engaging in sexual intercourse with JK and said she was lying.

A1C AW recalled another conversation among all four Airmen who were at the party during which Appellant said he wanted A1C AW to deny Appellant had gone to AB Benfield's house that night. However, A1C AW objected to this plan, saying it was a "bad lie" that could easily be disproved. As A1C NG later described this meeting, Appellant and AB Benfield asked A1C NG to recount what he remembered from that night. As A1C NG spoke, Appellant and AB

Benfield interjected at various points, telling him not to provide certain information to any investigators.

As the investigation progressed, Appellant was ordered to have no contact with JK. In addition, Appellant, AB Benfield, A1C NG, and A1C AW were relieved of their regular duties, placed in a "do not arm" status, and assigned to the "Facility Improvement Team" (FIT) to perform alternative duties. After their first day together on the FIT, their squadron commander ordered the four Airmen not to have contact with each other. Thereafter the four Airmen were dispersed to perform their alternative duties in different locations. However, after receiving the no contact order, Appellant continued to contact A1C AW using the SnapChat mobile phone application, inquiring whether A1C AW had spoken to investigators and, if so, what A1C AW had said. Appellant also had another member of the squadron call A1C AW on Appellant's behalf, seeking information.

## II. DISCUSSION

### A. Military Rule of Evidence 412

#### 1. Additional Background

At trial, the Defense attempted to introduce evidence of JK's alleged sexual predisposition and other sexual behavior by JK under exceptions to Mil. R. Evid. 412. The Government and JK, through counsel, opposed its introduction. Ultimately, the military judge allowed the Defense to introduce some of this evidence, including evidence that JK sat on AB Benfield's lap and engaged in oral sex with AB Benfield in front of the other Airmen during the party, which was offered to rebut JK's testimony that she had not flirted with anyone at the party.

The military judge excluded several other items of evidence pursuant to Mil. R. Evid. 412. *Inter alia*, the military judge excluded testimony regarding JK's purported preference for engaging in sexual activity with two men at the same time.[4] The Defense contended this particular testimony was relevant to the issue of consent and met the exception for constitutionally required evidence under Mil. R. Evid. 412(b)(1)(C). The military judge disagreed. In a written ruling, the military judge found as a threshold matter the proffered evidence did not actually demonstrate JK had such a preference. The military judge further found that, even if it did demonstrate such a preference, it was

---

[4] The trial transcript, appellate exhibits, and briefs addressing this excluded evidence were sealed pursuant to Rule for Courts-Martial (R.C.M.) 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

still not relevant to whether JK consented to Appellant's acts, or to a defense of mistake of fact as to consent. Finally, the military judge found any probative value was substantially outweighed by the dangers of "unfair prejudice and the ordinary countervailing interests reviewed in making a determination as to whether evidence is constitutionally required," although he did not specify what interests were implicated in this case.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). The application of Mil. R. Evid. 412 to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions, one of which is pertinent to this case. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted).

Mil. R. Evid. 412(b)(1)(C) provides that evidence of an alleged victim's other sexual behavior or sexual predisposition is admissible if its exclusion "would violate the constitutional rights of the accused." Generally, such evidence is constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (citation omitted). Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Materiality "is a multi-factored test looking at 'the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" *Ellerbrock*, 70 M.J. at 318 (alteration in original) (citations omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation

that is repetitive or only marginally relevant.'" *Id.* at 319 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

### 3. Analysis

Appellant contends the military judge abused his discretion by excluding testimony regarding JK's purported preference for engaging in sexual acts with two men at the same time. Specifically, Appellant contends that testimony regarding a purported statement by JK on a previous occasion when Appellant was not present, expressing interest in engaging in sexual activity with AB Benfield and a third individual, was relevant to the issue of JK's consent in Appellant's case and constitutionally required in light of Appellant's rights to due process and confrontation under the Fifth[5] and Sixth[6] Amendments. *See* Mil. R. Evid. 412(b)(1)(C). We disagree.

As a threshold matter, we find the evidence the Defense sought to introduce qualifies as evidence of JK's "sexual predisposition" for purposes of Mil. R. Evid. 412(a). Indeed, JK's purported predisposition to engage in sexual activity with multiple partners simultaneously is exactly what trial defense counsel sought to establish. Accordingly, the evidence was inadmissible unless an exception applied.

Evidence of sexual predisposition is not constitutionally required if it is not relevant. *See Ellerbrock*, 70 M.J. at 318; Mil. R. Evid. 402(b) ("Irrelevant evidence is not admissible."). We find the military judge did not abuse his discretion in determining the proffered evidence was not relevant to the issue of consent. Testimony to the effect that on a separate occasion, at which Appellant was not present, JK expressed interest in simultaneously engaging in sexual activity with AB Benfield and another male, without any reference to Appellant, creates no inference that JK consented to sexual activity *with Appellant.*

The Government draws our attention to this court's decision in *United States v. Stephan*, No. ACM 38568, 2015 CCA LEXIS 347 (A.F. Ct. Crim. App. 25 Aug. 2015) (unpub. op.). In *Stephan*, the military judge excluded evidence the victim engaged in consensual sex with one individual while squeezing the hand of another in the presence of the appellant and others. *Id.* at *3–4. Later, the appellant attempted to pull down the victim's pants without her consent. *Id.* In rejecting the appellant's argument that evidence of the victim's sexual activity prior to the offense was constitutionally required, we stated:

---

[5] U.S. Const. amend. V.

[6] U.S. Const. amend. VI.

> The fundamental question is whether the victim's sexual conduct with others, in the presence of the appellant, makes the existence of her consent to contact by the appellant, or a reasonable belief of such consent, more or less probable. We find it does not. *Consent to sexual contact is based on the identity of the partner, not on the victim's willingness to engage in any specific type of contact with others.*

*Id.* at *6 (emphasis added) (citation omitted). What was true in *Stephan* is even more pertinent in the case of Appellant, who was not even present when JK purportedly expressed interest in engaging in sexual activity with multiple partners. *See also United States v. Booker*, 25 M.J. 114, 116 (C.M.A. 1987) ("[C]onsent to the [sexual] act is based on the identity of the prospective partner.").

Appellant contends his position is consistent with *Stephan* because the proffered evidence *was* based on the identity of a particular partner, specifically AB Benfield, in addition to a "random" other male. We are not persuaded. The testimony would perhaps be relevant to JK's subsequent willingness to participate in sexual activity with AB Benfield, or with the unnamed male whom she purportedly indicated at the time; however, it is not probative of her consent to engage in sexual activity with Appellant.

To be clear, we are not holding that such statements could never meet the criteria for constitutionally required evidence under Mil. R. Evid. 412(b)(1)(C). For example, depending on a victim's testimony in a particular case, such a statement could become relevant and material for impeachment purposes. However, in this case, we agree with the military judge's conclusion that the proffered testimony was not relevant, and therefore was inadmissible under Mil. R. Evid. 412 as well as Mil. R. Evid. 402(b).

## B. Expert Testimony

### 1. Additional Background

At trial, JK testified that she received a mark on her neck when Appellant "tried to give [her] a hickey" at some point during the assault.[7] In addition, JK testified that AB Benfield held her by the neck during the assault. DR, the friend to whom JK initially reported the assault, testified that when he saw JK shortly after the assault he saw "scratches and red marks all up and down

---

[7] On cross-examination, HG, a registered nurse called by the Government as an expert in "Emergency Room Nursing," testified as to how a "hickey" is "typically formed": "someone would place their mouth on the skin and then be sucking on that skin, or biting on that skin to draw the blood to the surface."

her inner thighs, and slight red marks around her neck." JK's mother, SS, testified that she saw JK on the evening of 7 May 2016 before JK went to the party and did not see any bruises on her. When SS saw JK in the hospital the following day, she saw bruises on JK's neck. DM, a civilian police detective at the time, testified that he also saw bruises on JK's neck when he responded to the hospital that morning.

The Prosecution also called as a witness HG, a registered nurse who treated JK. HG testified that she had a bachelor's degree in nursing and had practiced as a nurse for approximately 20 years, with the majority of her nursing experience in labor and delivery. On 8 May 2016, HG was working in the hospital's emergency department. After HG described some of her duties and experience, including assessing, documenting, and assisting in the treatment of bruises and other injuries, assistant trial counsel sought to have HG recognized as an expert in "Emergency Room Nursing." The military judge so recognized HG after civilian trial defense counsel stated he had "[n]o objection."

Assistant trial counsel then had HG describe the "lifecycle" of bruises and how they change in appearance over time. HG described taking photos of JK to document injuries, including bruises on JK's neck. The Government introduced a number of photographs taken of JK that morning, including photos depicting scratches or abrasions on her hands, back, legs, and buttocks, as well as the bruises on her neck. When asked by assistant trial counsel, HG opined that the neck bruises were recent because of their color. Trial defense counsel did not object to this testimony. However, on cross-examination HG conceded that she did not have any "expert training" on determining the age of a bruise, other than her 20 years of experience as a nurse.

### 2. Law

A military judge's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Ellis*, 68 M.J. at 344 (citation omitted). However, "failure to make the timely assertion of a right" constitutes forfeiture, whereas "the intentional relinquishment or abandonment of a known right" constitutes waiver. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citation omitted). Where an appellant forfeits a right by failing to make a timely assertion at trial, appellate courts will review the forfeited issue for plain error. *Id.* (citing *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). In a plain error analysis, the appellant "has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (footnote omitted) (citation omitted). Waiver, by contrast, "leaves no error to correct on appeal." *Ahern*, 76 M.J. at 197 (citing *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)).

Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court of Appeals for the Armed Forces (CAAF) has articulated six factors for military courts to analyze to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Though *Houser* predates the leading United States Supreme Court decisions in this area, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Billings*, 61 M.J. at 166 (citations omitted).

However, "while satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). The military judge's inquiry is "flexible" and "tied to the facts of [the] particular case." *Id.* (citations omitted).

### 3. Analysis

Appellant now contends the military judge committed plain error when he permitted HG to testify about the age of the bruises on JK's neck because the "testimony was plainly outside of the scope of [HG]'s training and was not based upon an accepted and proven methodology." The Government responds that Appellant waived this issue when civilian trial defense counsel stated he had "no objection" to HG's qualification as an expert in "Emergency Room Nursing." We do not find waiver. The existence of waiver depends on the facts and circumstances of each case. *United States v. Elespuru*, 73 M.J. 326, 328 (C.A.A.F. 2014) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waiver

is the intentional abandonment or relinquishment of a known right. *Ahern*, 76 M.J. at 197. The failure to contest a witness's qualification as an expert in a particular field is not a relinquishment of the right to object at trial or on appeal to every opinion subsequently elicited from that witness by the opposing party. We find Appellant forfeited rather than waived his objection to this testimony, and therefore we test for plain error.

We do not find a "plain or obvious" error by the military judge. A witness may be qualified as an expert not only by reason of "training or education" but also by "knowledge, skill, [or] experience." Mil. R. Evid. 702. Prior to expressing her opinion that the bruises on JK's neck were new, HG testified that she had been a registered nurse for approximately 20 years. Her duties included assessing, documenting, and assisting in the treatment of injuries. She estimated she had seen "[h]undreds, maybe thousands" of patients with bruises and had assisted in the treatment of their injuries. HG further demonstrated her familiarity with the lifecycle of a bruise by explaining how bruises are formed and how their appearance changes over time. The foundation for HG's opinion was not the application of some controversial or newly-emerging scientific theory or technique that required the military judge to conduct a detailed analysis of *Houser* and *Daubert* factors to fulfill his gatekeeper role. Rather, it was an expert opinion based on HG's practical experience in observing and treating bruises and other injuries during her 20-year career as a registered nurse, as well as her personal observation of JK as one of the attending health care providers. Based on this foundation, we find no fault with the military judge's failure to *sua sponte* exclude HG's opinion that, based on her experience, the bruises she saw on JK's neck were newly-formed.

Assuming *arguendo* that the military judge did plainly err by permitting the testimony, we nevertheless find no material prejudice to Appellant's substantial rights. We test nonconstitutional errors for prejudice by assessing whether the error had a "'substantial influence' on the findings." *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). In doing so we consider four factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Clark*, 62 M.J. 195, 200–01 (C.A.A.F. 2005) (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

In this case, the materiality and quality of the admitted opinion testimony are most significant. HG simply opined that the bruises were newly-formed because of their red color. This was consistent with SS's testimony that JK did not have bruises on her neck before she went to the party on the evening of 7 May 2016. It was also essentially consistent with the photographs the Government introduced, with the testimony of SS, DR, and DM who described seeing

red marks on JK's neck after the assault, and with the testimony of JK that Appellant attempted to give her a hickey and that AB Benfield held her by the neck during the assault. In contrast, there was no evidence the bruises were present before the assault. Because HG's opinion testimony added little to the other evidence in the case regarding the neck bruises, its materiality was low and its impact was insubstantial.

Appellant contends HG's opinion testimony was prejudicial because it was "the only means by which to assign a specific injury of [JK] to Appellant" as opposed to AB Benfield. However, the materiality of whether Appellant or AB Benfield was the specific source of one of the bruises on JK's neck was low. Appellant was charged not for giving JK a hickey, but for raping her. We are confident the question of whether Appellant caused one of the bruises by putting his lips on JK's neck, or whether AB Benfield was the source of all the bruises on JK's neck as well as the numerous scratches on JK's thighs, buttocks, and back, had no substantial influence on the military judge's determination of Appellant's guilt.

## C. Factual Sufficiency

### 1. Law

We review issues of factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

As charged in this case, the elements of the offenses of rape in violation of Article 120, UCMJ, of which Appellant was convicted include: (1) that Appellant committed a sexual act upon JK by causing penetration, however slight, of JK's vulva and mouth by Appellant's penis; and (2) that Appellant did so with unlawful force, specifically, holding JK down with Appellant's hands and body weight and holding JK's head with Appellant's hand and inserting his penis in her mouth. *See Manual for Courts-Martial, United States* (2016 ed.) *(MCM)*, pt. IV, ¶ 45.b.(1)(a). "Force" means "the use of a weapon;" the use of

physical strength or violence "sufficient to overcome, restrain, or injure a person; or inflicting physical harm sufficient to coerce or compel submission by the victim." *MCM*, pt. IV, ¶ 45.a.(g)(5). "'[U]nlawful force' means an act of force done without legal justification or excuse." *MCM*, pt. IV, ¶ 45.a.(g)(6).

### 2. Analysis

Appellant advances several arguments as to why this court should not be convinced of his guilt beyond a reasonable doubt. *Inter alia*, Appellant contends the evidence of JK's behavior and other evidence suggests she in fact consented to sexual intercourse with Appellant. Appellant points to testimony regarding JK's flirtatious behavior and sexual act with AB Benfield at the party prior to the assault. However, a victim may of course consent to one sexual act but not to another. Furthermore, JK's behavior at the party with AB Benfield created no inference that she desired to engage in sexual intercourse with Appellant, someone she had never met before and in whom she expressed no sexual interest.

Appellant points to the absence of rips or tears in JK's clothing and to JK's testimony that Appellant did not hit or choke her to force her to open her mouth when he inserted his penis. He also relies on AB Benfield's testimony to argue that, contrary to JK's testimony, Appellant did not grab JK's head and JK never told Appellant "no" or pushed him away. However, AB Benfield, who admitted he was "feeling the effects" of alcohol that night, did not firmly deny these events occurred, only that he either did not see them or did not remember them.

Appellant also points to certain physical evidence. He emphasizes that AB Benfield, A1C AW, and A1C NG all saw what appeared to be one or more hickeys on Appellant's neck the day after the party, which Appellant said were made by JK although no witness observed how they were created. Appellant also cites the forensic testing which failed to identify Appellant's DNA on vaginal swabs from JK. However, the forensic biologist from the United States Army Criminal Investigation Laboratory called by the Defense testified on cross-examination that there were several possible explanations for this absence consistent with Appellant's penis penetrating JK's vagina. These potential explanations included the possibility that Appellant wore a condom; that he did not ejaculate; and that he simply shed relatively few skin cells that were not detected in the sample.

Conversely, the Government introduced compelling evidence of Appellant's guilt. JK testified Appellant held her head with his hands to insert his penis in her mouth and later penetrated her vagina with his penis, both without her consent. Although AB Benfield did not recall some of the events JK described,

he saw Appellant insert his penis in JK's mouth. Although he did not see Appellant's penis enter JK's vagina, he testified that after he withdrew from JK he saw Appellant "laying on top" of JK and "thrusting." AB Benfield also confirmed that, consistent with his earlier guilty plea to sexually assaulting JK, he knew she did not consent to the sexual intercourse. Appellant argues that the DNA evidence coupled with his highly intoxicated state suggest he did not actually penetrate JK's vagina. But Appellant's argument is undercut by his subsequent statements to A1C NG and AB Benfield that he did vaginally penetrate JK.

Appellant contends AB Benfield's testimony must be viewed with "extreme skepticism" given the two-year reduction to AB Benfield's own confinement that he received by virtue of his pretrial agreement to plead guilty to sexually assaulting JK. This agreement was undoubtedly a legitimate basis on which to cross-examine AB Benfield for potential bias. However, we are not persuaded that it was likely that AB Benfield falsely pleaded guilty to sexually assaulting JK. Moreover, AB Benfield's testimony was not uniformly helpful to the Government. Furthermore, we do not find that the relatively minor inconsistencies between AB Benfield's testimony and his prior statements demonstrate substantial bias against Appellant, as opposed to difficulty in remembering details attributable to the passage of time and AB Benfield's inebriated state at the time of the incident.

In addition, the Government introduced evidence that JK immediately reported the sexual assault to her friend DR in a highly distraught state. The Government introduced a recording of DR's 911 call in which JK can be heard sobbing in the background. The extensive scratches on JK's thighs, back, and buttocks and the bruising on her neck further indicate the violence of the encounter. Furthermore, Appellant's later attempts to have witnesses falsify or withhold information from investigators evidence consciousness of guilt. Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Accordingly, we find Appellant's convictions for rape to be factually sufficient.

## D. Sentence Appropriateness

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence ap-

propriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

Appellant asserts his sentence to eight years in confinement and a dishonorable discharge is "unduly severe" and requests this court reduce his term of confinement to five years. However, Appellant declines to articulate particular circumstances of his case that demonstrate this purported undue severity. Instead, Appellant simply asserts that "[a]n analysis of the past year's sexual assault trials reveals no sentence which survived appellate review and which was nearly as severe as [A]ppellant's," with the notable exception of AB Benfield's sentence. Appellant identifies five such cases by name but declines to describe the facts or circumstances of any of them.

We acknowledge that we may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence, although we are not required to do so.[8] *See United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001); *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). We find no reason to engage in such comparisons here. Other than his mere assertion that these other Airmen were also convicted of sexual assault and received lighter sentences, Appellant offers no rationale as to why his sentence should be closer to theirs or was otherwise inappropriate. Ironically, Appellant received a lesser sentence than the one Airman whose case *is* closely related to his own, AB Benfield, who even with the benefit of his pretrial agree-

---

[8] Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999).

ment received confinement for ten years, a dishonorable discharge, and reduction to the grade of E-1. *United States v. Benfield*, No. ACM 39267, 2018 CCA LEXIS 335, at *1 (A.F. Ct. Crim. App. 10 Jul. 2018) (unpub. op.).[9]

Appellant was convicted of orally raping a woman he had just met while she was being sexually assaulted by another Airman. Appellant then vaginally raped her as well. In addition, Appellant repeatedly violated a no-contact order from his commander and asked witnesses to provide false information in an effort to obstruct the investigation of his crimes. The military judge determined that a sentence to eight years of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1, in addition to the mandatory dishonorable discharge, was an appropriate punishment for these offenses. Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we cannot say the sentence imposed by the military judge is inappropriately severe.

## E. Suppression of Appellant's Statements to Staff Sergeant GW

### 1. Additional Background

At some point in the days following the rape of JK, Appellant sent a text message to his supervisor, Staff Sergeant (SSgt) GW, requesting to speak with him. SSgt GW was on temporary duty away from Whiteman AFB at the time, but after SSgt GW returned a few days later they met at Appellant's dormitory room on 15 May 2016. Appellant selected the location. At trial, SSgt GW testified he went not as an "investigator" but as a "supervisor" in order to "take care of [Appellant's] well-being and make sure he [wa]s okay."

When SSgt GW arrived, Appellant appeared "nervous" and "fidgety." At the time, SSgt GW was unaware of the sexual assault investigation and did not suspect Appellant of any offense. However, he did know Appellant was under the legal drinking age for alcohol. Because Appellant was hesitant to speak, SSgt GW explained:

> I just started asking him, you know, like what's going on? What's bothering you? Or what did you want to talk about? I don't think [Appellant] knew exactly how to start the conversation. So, I just gave him some stuff, you know, I was like is it family issues? Is it girlfriend, or, you know, what kind of incident was it? I said

---

[9] AB Benfield was convicted of one specification of sexual assault against JK and one specification of physical assault by touching another person's arm and shoulder without consent. AB Benfield's sole assignment of error in his appeal to this court was that *his* sentence was inappropriately severe compared to Appellant's. *Benfield*, unpub. op. at *1.

was there alcohol involved? And then that is when he kind of --
it sparked his reaction and he went into his -- his story.

SSgt GW did not advise Appellant of his Article 31, UCMJ, 10 U.S.C. § 831, rights; however, SSgt GW testified:

Before we got full into our story, or like him giving me his story, I let him know, I was like, you know, I am your supervisor, but at Security Forces. We are mandatory reporters, so anything that is very serious, that is a crime, I have to report. And I said, you know, with that, do you still want to get into this, or do you want me to refer you to someone else and [Appellant] said that he still wanted to talk so --.

Appellant then described to SSgt GW the party in very general terms and identified the attendees. He told SSgt GW he had gotten sick from the amount of alcohol he drank, "started to blackout" around the time he was preparing to proceed to AB Benfield's house, and did not remember anything after that until he awoke at AB Benfield's house the next morning and prepared for work. Appellant then told SSgt GW that AB Benfield later approached Appellant and said they needed to "make up a story" that would "cover" them. Appellant told SSgt GW that he "didn't understand what [AB] Benfield was talking about."

At trial, the Defense moved to suppress Appellant's statements to SSgt GW because of SSgt GW's failure to advise Appellant of his Article 31, UCMJ, rights. The military judge denied the motion in an oral ruling. The military judge found that SSgt GW was not acting in a law enforcement or disciplinary capacity but merely as a concerned supervisor. He further found that Appellant did not subjectively view the conversation as an interrogation by SSgt GW in an official capacity, and similarly that an objectively reasonable person in Appellant's position would not have perceived the conversation as such an interrogation. The military judge further found that even if SSgt GW were required to advise Appellant of his Article 31 rights for suspicion of underage drinking, the rights advisement was not required for his statements related to the offense of sexual assault.

### 2. Law

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (citation omitted). "When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo." *Id.* (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)). Whether a questioner was acting or could reasonably be considered to be acting in a law

enforcement or disciplinary capacity is a question of law requiring de novo review. *Id.* at 361 (citations omitted).

Article 31, UCMJ, states in pertinent part:

> (b) No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.
>
> . . . .
>
> (d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *Jones*, 73 M.J. at 361 (footnotes omitted) (citation omitted). However, the second of these prongs is met only if the questioner was acting in an official law enforcement or disciplinary capacity, or could reasonably be considered to be acting in such a capacity by a "reasonable person" in the suspect's position. *Id.* at 362. "Questioning by a military superior in the immediate chain of command 'will normally be presumed to be for disciplinary purposes,'" although such a presumption is not conclusive. *Swift*, 53 M.J. at 446 (quoting *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)) (additional citations omitted).

An "interrogation" includes "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil. R. Evid. 305(b)(2).

**3. Analysis**

In the military judge's oral ruling, he cited various factors in support of his conclusions that SSgt GW was not acting in an official law enforcement or disciplinary capacity during his conversation with Appellant, and that a reasonable person would not have perceived SSgt GW in such a role. These factors include that Appellant requested the conversation, chose the location, and chose the topic. The military judge acknowledged that although "in certain circumstances" SSgt GW's warning to Appellant that as a Security Forces member SSgt GW would have to report any crimes "could be interpreted as acting

in an official capacity," in this case it was "merely a reminder that their discussion was not confidential." We are not so sanguine. In light of SSgt GW's specific reference to his law enforcement role and the CAAF's admonition that questioning by a military superior is "normally presumed" to be in a disciplinary capacity, we decline to base our decision on a conclusion that SSgt GW had no such role in this case.[10] *See Swift*, 53 M.J. at 446.

Nevertheless, assuming *arguendo* SSgt GW was or might reasonably have been perceived to be acting in a disciplinary or law enforcement capacity, we find Appellant was not prejudiced by any error with respect to SSgt GW's testimony. Failure to advise of Article 31, UCMJ, rights, absent evidence the suspect's statement was "involuntary" or the result of "custodial interrogation," is a nonconstitutional error. *United States v. Evans*, 75 M.J. 302, 305–06 (C.A.A.F. 2016). Therefore, we test for prejudice by assessing whether the error had a "substantial influence" on the findings. *Walker*, 57 M.J. at 178 (quoting *Kotteakos*, 328 U.S. at 765). In doing so we consider four factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Clark*, 62 M.J. at 200–01 (quoting *Kerr*, 51 M.J. at 405).

Appellant argues SSgt GW's testimony was not harmless with respect to the charge that Appellant endeavored to impede an investigation because the testimony "confirmed a scheme to obstruct justice involving Appellant and [AB Benfield]." We disagree. The relevant portion of SSgt GW's testimony was essentially comprised of two short paragraphs in which, as related by SSgt GW, Appellant did not describe participating in a scheme but rather tended to deflect blame onto AB Benfield. Trial defense counsel declined to cross-examine SSgt GW on this brief testimony. More importantly, the testimony of A1C AW and A1C NG, whose accounts were corroborated in a general way by AB Benfield, directly indicated Appellant's efforts to impede the investigation of the sexual assault on JK. Considering the relative strength of the Government and Defense cases with respect to this charge, as well as the quality and materiality of SSgt GW's testimony, we find any error in the admission of that testimony did not substantially influence the military judge's findings of guilt.

---

[10] We note the record would support a finding that SSgt GW did not "interrogate" Appellant; that is, one could conclude there is an absence of evidence that SSgt GW asked any question intended or likely to elicit an incriminating response at a point in time when he had reason to suspect Appellant of an offense. *See* Mil. R. Evid. 305(b)(2); *Jones*, 73 M.J. at 361. However, because neither the military judge at trial nor the Government on appeal rely on this basis, and in light of the alternative basis for rejecting Appellant's argument, we also decline to rest our decision on a finding that there was no "interrogation."

**F. Discovery and Production**

**1. Additional Facts**

During the investigation of the assault on JK, Special Agent (SA) ZP of the Air Force Office of Special Investigations (AFOSI) interviewed JK and extracted data, including text messages and call logs, from JK's cell phone on 10 June 2016. SA ZP then returned JK's cell phone to her. At trial, SA ZP testified he did not find any text messages between AB Benfield and JK from 8 May 2016 or earlier. Prior to trial, the Government provided 263 pages of text messages and 26 pages of call logs from JK's cell phone to the Defense.

At trial, there was some testimony that AB Benfield and JK exchanged text messages during the party on 7–8 May 2016. A1C NG testified that he saw a text message between AB Benfield and JK sometime that evening. AB Benfield testified he saw text messages from JK during the party, including messages about Appellant, but he believed JK had deleted them. For her part, JK testified she took a few SnapChat photos during the party, but she could not remember if she had shared text messages with AB Benfield during the party, or if so, whether she had deleted such messages.

**2. Law**

Each party to a court-martial must have an equal opportunity to inspect evidence and to obtain witnesses and other evidence. *United States v. Stellato*, 74 M.J. 473, 483 (C.A.A.F. 2015) (citing R.C.M. 701(e) and Article 46, UCMJ, 10 U.S.C. § 846). The CAAF "has interpreted this requirement to mean that the 'Government has a duty to use good faith and due diligence to preserve and protect evidence and make it available to an accused.'" *Id.* (quoting *United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1986)). "The duty to preserve includes: (1) evidence that has an apparent exculpatory value and that has no comparable substitute; (2) evidence that is of such central importance to the defense that it is essential to a fair trial; and (3) statements of witnesses testifying at trial." *Id.* (citations omitted).

"Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703((f)(1), Discussion).

19

**3. Analysis**

Although the Defense did not raise the issue at trial, Appellant now contends the Government failed to exercise due diligence to obtain exculpatory evidence. Specifically, Appellant contends the Government was on notice that text messages JK wrote during the party on 7–8 May 2016 existed, that these messages were exculpatory because they tended to show JK was attracted to Appellant and consented to the subsequent sexual encounter, and that JK's cell phone was "within the control of the [G]overnment" because JK worked on the base and her phone would have been subject to search and seizure at the direction of military authorities. We disagree.

Because the cell phone was no longer in the Government's possession once it was returned to JK, the appropriate analysis is production under R.C.M. 703(f) rather than discovery under R.C.M. 701. *See United States v. Bishop*, 76 M.J. 627, 634 (A.F. Ct. Crim. App. 2017), *rev. denied*, 76 M.J. 401 (C.A.A.F. 2017). Appellant fails to demonstrate that, having received the AFOSI data extraction, any remaining information on JK's cell phone was either relevant or necessary. *See Rodriguez*, 60 M.J. at 246. There is no indication the AFOSI data extraction on 10 June 2016 failed to retrieve any text messages existing on the phone as of that date. In other words, there is no reason to believe that text messages from prior to 9 May 2016 that were not on the cell phone on 10 June 2016 would be found on the phone at a later date.

Furthermore, Appellant fails to demonstrate that such text messages, if they ever existed, were in fact helpful to the Defense, much less "exculpatory." Neither of the witnesses who purportedly saw such messages testified that they indicated JK was attracted to Appellant. To the contrary, AB Benfield testified that during the party JK told AB Benfield she was not interested in Appellant. Appellant is therefore entitled to no relief on this basis.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court